**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MANATEE DIVISION**

Case No.:

| | |
|---|---|
| ALVARO BRENES, an Individual,<br><br>      Plaintiff,<br><br>vs.<br><br>TRIEST AG GROUP, INC., a Delaware Corporation, DEAN STORKAN, an Individual, STEPHEN LYERLY, an Individual,<br><br>      Defendants, | <u>**COMPLAINT AND**</u><br><u>**JURY DEMAND**</u> |

Plaintiff, ALVARO BRENES, an individual (hereinafter "**Brenes**"), by and through its undersigned counsel, hereby files suit against TRIEST AG GROUP, INC. a Delaware Corporation (hereinafter "**Triest**"), DEAN STORKAN, an individual (hereinafter "**Storkan**") and STEPHEN LYERLY, an Individual (hereinafter "**Lyerly**") (Triest, Storkan and Lyerly collectively referred to as "**Defendants**") and state as follows:

<u>**PARTIES**</u>

1.    Plaintiff ALVARO BRENES is an individual, of legal age, sui juris, and domiciled at San Rafael de Escazú, Costa Rica.

2.    Defendant TRIEST AG GROUP, INC is a Delaware Corporation, duly authorized to transact business by the Florida Department of State, Division of Corporations, under document number F13000001924, and doing business in Florida, at 7610 US Hwy 41 N. Palmetto, Florida 34221. On or about 2010, Triest merged with Hendrix & Dale, Inc, with Triest being the surviving

1

entity. Additionally, Triest continues to do business under the commercial trade name "Hendrix & Dale."

3.      Defendant DEAN STORKAN is an individual, of legal age, sui juris, and domiciled in the State of California. At all material times hereto, Storkan was also the majority owner of Triest and/or its controlling entities.

4.      Defendant STEPHEN LYERLY is an individual, of legal age, sui juris, and doing business in Florida with domicile at 4571 Riverview Blvd, Bradenton, Florida 34209 and principal place of business located at 7610 US Hwy 41 N. Palmetto, Florida 34221.

## JURISDICTION, VENUE AND PRECEDING CONDITIONS

5.      This Court has jurisdiction over the dispute pursuant to 28 U.S.C. 1332(a)(2) because this Complaint seeks damages or equitable relief in excess of $75,000.00, exclusive of interest, costs and attorney's fees.

6.      Diversity Jurisdiction: This Cour has diversity jurisdiction, because Plaintiff is a citizen of Costa Rica, Defendant TriEst is a Corporation domiciled in the State of Delaware, Defendant Storkan is a citizen of the State of California, and Defendant Lyerly is a citizen of the State of Florida.

        a.    Personal Jurisdiction: This Court has jurisdiction over Defendants because they operate, conduct, engage in, or carry on a business or business venture in Manatee County, Florida. At all times material to this Complaint, Defendants have operated a manufacturing plant and product distribution center at 7610 US Hwy 41 N. Palmetto, Florida 34221. Additionally, the Parties by mutual assent, consented to Florida as the appropriate jurisdiction to resolve controversies between them.[1]

---

[1] Plaintiff and Defendants signed a document improperly labelled "Shareholders Agreement" (attached below) where their intent to submit to Florida is clear and unequivocal. Notwithstanding, Plaintiff seeks to avoid the terms of the

7.     Venue lies within this circuit pursuant to 28 U.S.C. 1391(b)(1)-(2) as follows:

8.     All conditions precedent to Brenes maintenance of this action have occurred, or their performance has been excused or waived by Defendants.

9.     Brenes has retained undersigned counsel to represent him in this litigation, and he has agreed to and has become obligated to pay the undersigned counsel's reasonable attorneys' fees, provided a proper proffer and request are made pursuant to Florida law.

## **NATURE OF ACTION**

10. This is an action for damages at law or equitable relief, arising out Defendants unlawful conduct with respect to Plaintiff.

11. Pursuant to the claims made hereunder, Plaintiff seeks damages, pre-judgment and post-judgment interest, reserves the right to seek attorney's fees and costs, and the right to seek punitive damages.

## **PREQUEL – PARTNERSHIP AGREEMENT AND TRUST RELATIONSHIP**

12. On or around the early 2000's, Brenes, an engineer, was the beneficial owner and sole manager of an entity named Disal S.A. (hereinafter "**Disal**"), organized under the laws of Panama.

13. For a period of eight years, spanning from 2001 thru 2009, Brenes, through his entity, Disal, was appointed as Triest's distributor for the Central American region, more specifically for the following countries Guatemala, Honduras, El Salvador, Nicaragua, Costa Rica and Panama (hereinafter the "**Region**").

14. During those eight years, Brenes consistently dealt with Storkan and Lyerly while in the process of commercially developing Triest's market for the Region.  Brenes build a relationship of

---

Agreement as a shareholder's agreement and contends that it only evidence of the parties intent to enter into a partnership agreement.

trust and confidence with Storkan and Lyerly which went beyond a purely arms-length commercial relationship.

15. Brenes, during those years, repeatedly visited Triest's manufacturing and distribution facility located in Palmetto, Florida.

16. Brenes engaged in multiple communication exchanges and had personal meetings with both Storkan and Lyerly, in Palmetto, Florida.

17. Throughout the relevant period, Brenes excelled in his role as a distributor for Triest, significantly increasing Triest's sales in the region from Forty Thousand (40,000) liters a year to Nine Hundred Thousand (900,000) liters a year.

18. Storkan and Lyerly, impressed by Brenes performance, approached him with the intent of forming a partnership to become joint partners for distribution of Triest's products in an expanded territory that included the Region and Dominican Republic and Colombia (hereinafter the "**Partnership Territory**")

19. Brenes, considering the close relationship he had developed with Storkan and Lyerly, and the fact that he confided and trusted them, accepted their invitation.

20. On or about 2009, Brenes and Storkan entered into a partnership agreement (the "**Partnership**"). It was simple and straightforward: Brenes, Storkan and Triest would partner up to develop and attend the Partnership Territory while sharing, proportionally, the partnership's profits and losses.

21. Brenes would be the ultimate beneficial owner of 49% of the Partnership interests and Storkan -individually and through Triest - would be the ultimate beneficial owner of 51% of the Partnership interests.

**INSTRUMENTATION OF PARTNERSHIP AGREEMENT**

22. After several meetings and exchange of communications, Brenes and Storkan (collectively referred to as the "**Partners**"), with the active participation and acquiescence of Lyerly, decided that they would use a special purpose vehicle, in the Region, to attend the Partnership Territory.

23. On or about July 1, 2009, the Partners further memorialized certain "essential arrangements between and among the [Partners] with respect to the governance of the Company and the Subsidiaries." The Partners then executed a document labelled Hendrix & Dail Central America Shareholders Agreement ("**SPV Agreement**").[2] A true and correct copy of the Partnership Agreement is attached hereto and incorporated herein by reference as **Exhibit "A".**

24. The Partners decided that they would incorporate a Panama corporation, by the name of Hendrix & Dail Central America S.A. (the "**SPV**") and use it as a holding company. Consistently, the Partnership Agreement, Recital (ii) unequivocally provided that "the [SPV] has been incorporated as a special purpose vehicle in order to own stock capital of the subsidiaries as defined [in the Agreement]."

25. The Partners, Storkan individually and through Hendrix and Dail, Inc. (later on merged into Triest) would hold fifty-one percent (51%) of the ownership interest in SPV and Brenes through his company Disal S.A., would hold forty-nine percent (49%) of the ownership interest in the SPV.

26. The Partners intent with respect to the purpose of this SPV was also unequivocally declared:

---

[2] Plaintiff claims that the document was improperly labelled as a Shareholders' Agreement when in fact it was an understanding of certain essential arrangements between and among [the Parties] with respect to the governance of the Company and its subsidiaries. At the time the "Shareholders Agreement" was signed, Hendrix and Dail Central America did not exist as a legal entity nor was this alleged Shareholders Agreement ratified in accordance with Panama Law.

2.2    **Purpose of the Company**. The Company was created[3] for the purpose of acting as the central financial and management office for the operations of the subsidiaries. The Company shall become the sole shareholder of those entities.

27. Storkan, as a Partner of the Partnership with Brenes, contributed $500,000 into the SPV in the form of a cancellation of $500,000 in receivables currently due from Disal to Hendrix and Dail, Inc. See Ex. A., pg. 2.

28. Brenes, as a Partner of the Partnership with Storkan, also contributed $500,000 into the SPV in the form of a promise to pay the amount of $250,000 and up to $250,000 for one half of the cost of completing the formulation and filing facility. See Ex. A., Pg. 2-3.

29. Brenes and Storkan, as partners of the Partnership, had agreed that they would finish the building of a formulation and filing facility in the Partnership Territory, facility which Brenes had begun to construct, so that product could be sourced out directly from Honduras and not the U.S.

30. Consistent with their agreement at the Partnership level, Brenes and Storkan agreed that the filing facility profits would be allocated differently between the Partners. During the first three years of operations, Storkan, through Hendrix and Dial, Inc. would take eighty percent (80%) of the profits (See Ex. A., pg. 5) and Brenes, through Disal, would take twenty percent (20%) of the profits. See Ex. A., pg. 5.

31. Profits for the fourth year would be distributed 60% to Storkan through Hendrix and Dial, and 40% to Brenes through Disal. See Ex. A. pg. 5.

---

[3] At the time of execution of this Agreement, the Company had not been formed in compliance with Panama legal requirements.

32. Commencing on the fifth anniversary of the filing facility, profits would only be paid to Storkan, through Hendrix and Dail, Inc., at the amount of equal to four percent (4%) of the net profits of the "Entity."[4]

33. Presumably, because the SPV Agreement remained silent, any losses would be allocated according to the Partnership's profit and loss allocations i.e., Storkan would bear the burden of fifty-one percent (51%) of the losses and Brenes would bear the burden of forty-nine (49%) percent of the losses.

34. Additionally, also as part of its Partner commitments, Storkan caused Hendrix and Dail, to appoint the Company and each subsidiary as its exclusive distributor in Costa Rica, Guatemala, Honduras and Dominican Republic, for its fumigants, subject to reasonable annual pricing adjustments. See Ex. A., Pg. 4. Conversely, the Company would refrain from competing with Hendrix and Dail, Inc. with respect to its line of fumigants. Id.

35. On or around July 21, 2009, the articles of incorporation for Hendrix & Dail Central America were notarized, instrumented into a Public Deed, and thereafter registered with Panama Corporations authority. A true and correct copy of the Panama Public Deed that incorporates the SPV's articles of formation is attached hereto and incorporated herein, as **Exhibit "B."**

36. Notably, the SPV's Articles of Formation are not a reflection of what was agreed by the Partners in the SPV Agreement. But rather a general standard like form of articles of incorporation.

37. For instance, the Articles of Formation provide that the initial capital contribution of the SPV was $10,000 (See Ex. B, pg. 8), whereas the Partners, in the SPV Agreement had agreed that they would contribute assets in the amount of $1,000,000. See Ex. A, pg. 8.

---

[4] The SPV Agreement refers to an "Entity" but the term is not defined or cross-referenced to any existing legal entity.

38. Further, whereas the SPV Agreements provides for certain limitations on the authority of the SPV's representatives ("**Major Business Decisions of the Company**"), the SPV's articles of formation carries none of these. See Ex. A, pg. 2-3.

39. There was trust and confidence between Mr. Brenes, Mr. Storkan and Mr. Lyerly. They were appointed as the SPV's Directors and Officers (See Ex. B., pg. 11) and because of the close relationship of over 8 years of working closely, that sufficed. Even if it differed from the terms of SPV's Agreement. See Ex. A. and B.

40. Brenes, Storkan and Lyerly had a close relationship, a relationship of trust and confidence, and based on such, Brenes accepted them to be majority members of the SPV's Board of Directors. See Ex. B., pg. 11.

41. Also, Brenes trusted his Partner Storkan and as well as Lyerly, to the extent that the entire terms and conditions regulating the product distribution were incorporated in only two sections of the SPV's Agreement.  See Ex. A. pgs. 4 – 5.

42. The initial owners of the SPV's ownership interests were Edgardo Eloy Diaz and Fernando Antonio Gil. Neither Brenes nor Storkan were mentioned in the SPV's Articles of Formation. There was a lot of trust and confidence between them, no doubt. See Ex. B. pg. 12.

### OPERATIONAL MALFEASANCE

43. The Partnership operated successfully during the first few years.

44. Brenes headed the SPV and its subsidiaries.[5] Independent from his Partnership relationship with Storkan, Brenes was appointed as the head officer of each entity. After all, Brenes had spearheaded the initial product launching throughout the Region during his tenure as an independent distributor.

---

[5] Brenes, along with Storkan and Lyerly, formed the following subsidiaries, all of which where wholly owned by the SPV. [_____

45. Initially, Brenes would purchase product from Triest's Palmetto branch. Storkan and Lyerly caused Triest to export product to the Partnership Territory. Product was imported by each of the subsidiaries on a needed/demand bases.

46. Payments were initially made through checks sent to the Palmetto Branch. As the relationship with the filling facility evolved, payments transitioned to wire transfers. These wire transfer payments were made to Triops, a company related to Storkan and Triest. The bank account used for these wire transfers belonged to Hendrix and Dale Honduras.

47. A filling facility was established and began operations around 2010. This filling facility consisted of two warehouses for finished products, administrative offices, storage tanks with a capacity of 24,000 gallons, and three computer-controlled automatic filling scales. Brenes, funding it himself, nearly completed the construction of a state-of-the-art manufacturing and filling facility in Honduras during his time as a distributor.[6]

48. The rationale for the filling facility's establishment was to reduce costs and increase the SPV's profitability.

49. Originally, Palmetto charged the SPV 23 cents per liter for filling. By having the filling facility, the Partnership could cut down on filling fees and import freight costs.

50. Notwithstanding the foregoing, Storkan and Triest never implemented such savings for the benefit of the SPV, but rather, as they did with other cost matters, allocating the profit at the level of Triest or affiliate companies prejudicing Brenes.

51. In its initial years, the Partnership saw successful operations. Brenes led the SPV, driving an increase in the product's market share within the Territory.

---

[6] It was built to Dow Chemical's high standards since it would undergo their inspection and certification. Dow Chemical set strict storage guidelines for their products, which the Partnership bought for either bulk sales or for further manufacturing.

52. The partners received one dividend distribution directly from the SPV's account in the amount of $100,000.

53. Around 2014, the partnership began to experience strain.

54. By this point, the SPV had accumulated approximately $6,000,000 in retained earnings.

55. Because of the business's high cash flow demands, the partners had agreed to keep these earnings as a reserve which was classified, accounting wise, as retained earnings.

56. Storkan and his agents had consistently pressured Brenes to pay part of his contribution into the Partnership.

57. The Partners had mutually agreed that Brenes' contribution to the partnership would be settled over time using dividends flowing outbound from the SPV.

58. During a Partners meeting that took place in Las Vegas, Nevada, Brenes suggested capitalizing his 49% retained earnings to offset his capital contribution liability with Storkan and Triest.

59. This move would settle Brenes's debt, and the Company would retain its resources, given that these retained earnings were tied up in inventory and accounts receivable.

60. Storkan inquired with Triest Group's CFO about the authenticity of these retained earnings, which the CFO confirmed. Consequently, Storkan greenlit Brenes's proposal, instructing the Triest Group's legal and accounting teams to facilitate this.

61. Following the implementation of the decision taken on this meeting, Brenes would be debt-free with the Partnership, and the Company would retain its assets. Neither Storkan nor Triest would see any change in their position in the Partnership.

62. However, a month later, Storkan backtracked on his decision regarding the use of retained earnings, opting instead to disburse only $200,000 in dividends and keep the remaining profits as retained earnings.

63. Brenes, suspects that this decision was fueled by Storkan's self-interest with respect to Triest Group, even though it was clearly to his partner, Brenes' detriment.

64. Storkan's affiliated and related companies benefited from such decision.

65. Brenes dissatisfied with this change, proposed an automatic system for determining and distributing dividends. This idea was also rejected.

66. Storkan, either directly or via his representatives Lyerly and Mark McCaslin, orchestrated a plan that ultimately marginalized Brenes as a minority Partner, culminating in the auctioning off of Brenes's stake in the SPV.

67. Storkan then began utilizing other subsidiaries and affiliates in ways that would devalue the Partnership while at the same time allocating profits from the Partnership Region, only for Storkan's benefit.

68. For example, Storkan allowed Agro Quimicos de Levante (AQL) from Valencia, Spain, access to the SPV Partnership Territory, which diminished the SPV's market share.

69. Not only was this agreement meant to reduce the SPV's profits but also was a violation of the exclusivity that was given to the Partnership for the Partnership Territory.

70. Storkan and Triest, self-interested in the transaction, never did anything to protect the SPV's right of exclusive distribution and rather kindled the relation with the competitor to an extent that severely impacted the SPV's operations.

71. Brenes informed Storkan that AQL was undercutting prices, selling products in the region at rates even lower than what Storkan was charging the SPV.

72. Storkan disregarded Brenes's alerts and continued supporting AQL's practices, causing a notable revenue drop. Brenes estimated that the SPV's market share was reduced by about 50%, while Storkan still profited from sales to AQL.

73. Further, concurrently with the AQL unlawful competition, Storkan and his agents set out to impose policies upon the SPV that would ultimately drive the business to the ground.

74. While AQL was getting favorable prices for raw materials, Storkan and his group, started charging the SPV with higher prices for products that were being imported by the SPV. Certainly, allocating a higher profit at the level of Storkan affiliates (non-related to Brenes) and reducing the SPV's profit margins.

75. Also, Storkan and his agents increased inventory financing interest rates, making it more difficult for the SPV to have a product rotation significant to compete in the region. Once again, allocating a higher profit at the level of Storkan affiliates (non-related to Brenes) and reducing the SPV's profit margins.

76. Not of less importance, Storkan unilaterally and without any consideration to the SPV, imposed a five (5%) commission on every product sold to the SPV through TriOps, another of Storkan's affiliates. Consistent with the above, allocating a higher profit at the level of Storkan affiliates (non-related to Brenes) and reducing the SPV's profit margins.

77. Storkan also mandated an insurance company for the SPV that hiked the insurance costs to over $150,000 annually. Indirectly subsidizing Storkan's insurance costs spread across his affiliates (non-related to Brenes) and reducing the SPV's profit margins.

78. By the last quarter of 2017, Storkan and his team enforced a write-off on yet-to-be-collected accounts receivable for the SPV, which affected the company's bottom line. They claimed that Storkan's affiliates would benefit from foreign losses under a new U.S. tax rule.

79. Some of the SPV's accounts receivables where then intentionally misclassified as uncollectible, requiring the SPV to affect its bottom line with the write-off.

80. Storkan and his agents instructed Brenes to permit such arrangement in response to what they told Brenes was a newly enacted rule by the Trump administration allowing U.S. profits to be offset by losses from foreign subsidiaries or affiliates.

81. Soon after imposing this measure on Brenes, in early 2018, they compelled Brenes to settle his equity debt by giving up 10% of his SPV stake, using a company undervaluation.

82. That year, Storkan directed an agent to hire Camacho Group for a valuation of Brenes's shares.

83. Camacho Group's valuation determined that 10% of Brenes's interests was worth $675,000.

84. Even though the Partnership consistently turned a profit, Brenes only received dividends on two occasions, each amounting to one hundred dollars. Notably, the SPV's average annual profit stood at roughly $450,000, of which Brenes held a 49% stake.

85. Storkan's actions were evidently aimed at diverting profits from the SPV to benefit his affiliated or associated companies.

86. Storkan solely in pursuit of his interests, continued to sideline Brenes, leaving Brenes contemplating exit strategies.

87. On September 15, 2022, Brenes was removed as an officer of the SPV, stripping him of his only means of safeguarding his partnership stake.

88. Notwithstanding the foregoing, Brenes was only formally removed by a shareholder's meeting carried out on January 30, 2023.

89. Storkan initiated negotiations with Brenes, and in this process, he hired Grupo Camacho for another valuation.

90. Grupo Camacho, using various tactics, deceitfully valued the company at zero. This zero valuation was beneficial for Storkan as it enabled him and his associates to acquire Brenes's stake at no cost. Moreover, they had an alleged enforceable debt to use against Brenes as leverage.

91. In contrast, Brenes's valuator, using different and accurate premises, valued the company between $8 million (accounting for Camacho Group's misinformation) and as high as $24 million based on market data.

92. Both valuations by Camacho Group and Brenes's expert failed to consider Storkan's actions that had diminished the company's market share and profitability which if they would have been considered, would have yielded a higher valuation.

### COUNT I – BREACH OF DE-FACTO PARTNERSHIP
### (against Storkan and Triest)

93. Plaintiff reaffirms and reasserts the allegations made in Paragraphs 1-92 as if fully recited and reincorporated below.

94. Plaintiff and Defendant Storkan entered into a de-facto partnership (the "**Partnership**") for the import, distribution and sale, of fumigants.

95. The Partnership was formed with an indefinite time of duration.

96. Plaintiff would have been entitled to forty-nine percent (49%) and Defendant Storkan would be entitled to fifty-one percent (51%) of the Partnership's profits and losses.

97. Plaintiff and Defendants agreed that such profit allocation would be different in terms of the filling fee charged as a result of the filling facility.

98. During the first three years of operations, Storkan, through Hendrix and Dial, Inc. would take eighty percent (80%) of the profits (See Ex. A., pg. 5) and Brenes, through Disal, would take twenty percent (20%) of the profits. See Ex. A., pg. 5.

14

99. Profits for the fourth year would be distributed 60% to Storkan through Hendrix and Dial, and 40% to Brenes through Disal. See Ex. A. pg. 5.

100.    The previous provision indicates that both the Plaintiff and the Defendants recognized the necessity to distribute profits and losses. They explicitly made an exception for the specific business activity of filling, implying that for all other matters, profits and losses should be divided according to each party's share in the partnership.

101.    Initially, Brenes, Storkan and Lyerly were active in management of Partnership's enterprise in the Partnership Territory.

102.    Storkan was appointed as a Director and Officer of the SPV. So was Brenes.

103.    Decisions were made and carried out with the active participation of Storkan, directly, or through Lyerly other representatives.

104.    Both, Storkan and Brenes had a proprietary interest in the Partnership enterprise: Storkan owned and controlled the manufacturer of products and Brenes had significantly developed a market in the Partnership Territory for Triest's Products.

105.    In carrying out the Partnership enterprise, Plaintiff Brenes worked tirelessly to maintain the market share he had initially secured for Storkan's products and further continue growing it.

106.    Defendants, failed to act in the best interests of the Partnership, by amongst others intentionally allocating raw material prices to exclude Brenes from profiting according to their Partnership.

107.    Defendants failed to act in the best interests of the Partnership by amongst others, intentionally failing to implement the filling percentage distribution agreed and retaining all the benefit from the filling operation.

108.    Defendants failed to act in the best interests of the Partnership in entering into a relationship with a competitor in the Partnership Territory and provide it with more competitive terms indirectly interfering with the SPV's market share and profitability.

109.    Defendants failed to act in the best interests of the Partnership when they ordered Brenes to write-off collectable accounts receivable in order to benefit from a tax rule that only benefit Defendants.

110.    Defendants failed to act in the best interests of the Partnership by failing to allow Brenes to payoff its contribution through retained earnings in an attempt to completely oust Brenes from the SPV and allegedly from the Partnership.

111.    More particularly, in doing so, Defendant Storkan has managed or caused to be managed partnership business for his sole benefit and without Plaintiff's consent, while at the same time having an interest adverse to the partnership, breaching therefore the duty of loyalty that Defendant had with Plaintiff.

112.    Defendant also allowed that Defendant Lyerly and/or other of his representatives knowingly act in violation of the laws regulating the SPV's subsidiaries, only in furtherance of his interests, and not the Partnership's and/or Plaintiff's.

113.    Defendants' actions were the legal cause of Plaintiff's damages.

114.    As a result of Defendants conduct, Plaintiff has suffered damages for earned and unlawfully retained earnings, loss of profit that was unlawful allocated to Defendants to Plaintiffs detriment.

115.    As a result of Defendants conduct, Plaintiff has suffered other compensatory and consequential damages all as may be proven in trial.

116.    Plaintiff is entitled to receive reparation of damages from Defendants.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enters judgment in its favor and against Defendant as follows:

a.    That Defendant Storkan, directly or through Defendant Triest, breached the de-facto Partnership Agreement he had with Plaintiff Brenes.

b.    That Defendant Triest breached the de-facto Partnership Agreement it had with Plaintiff Brenes.

c.    Storkan's and Triest's breach of the Partnership Agreement was the legal cause of Plaintiff's damages.

d.    That Plaintiff is entitled to collect from Defendants, the amount of damages as may be proven at trial.

e.    Any other relief that the Court deems fair and just.

## COUNT II – BREACH OF COMMON LAW DUTY ALTERNATIVE TO COUNT I
### (against Storkan and Lyerly)

117.    Plaintiff reaffirms and reasserts the allegations made in Paragraphs 1 - 92 as if fully recited and reincorporated below.

118.    By virtue of the close relationship that had been developed for more than a decade, since the time Plaintiff was a distributor for over eight years throughout the first seven years into the Partnership, Plaintiff confided and trusted Defendants.

119.    Plaintiff and Defendants had developed a relationship of trust, in which Plaintiff was led to believe that Plaintiff could rely on Defendants loyalty with respect to Plaintiff.

120.    Especially, Plaintiff was misled by Defendants that all actions that were taken with respect their course of dealings, where in and for the benefit of both Plaintiff's and Defendants' interests.

121.    Plaintiff put his trust in Defendants to protect his financial interests in the Partnership and the market for products that Plaintiff had developed in the Partnership Territory.

122.    Defendants breached their duty of loyalty with Plaintiff by failing to protect Defendants interest in the Partnership and the market for products that Plaintiff had developed in the Partnership Territory by engaging in self-interest transactions to Plaintiff's detriment.

123.    Defendants engaged in conduct as set forth in Paragraph's 57 thru 88 of this Complaint, which clearly constitutes a breach of the common law duty that Storkan and Lyerly had with respect to Plaintiff.

124.    Plaintiff has suffered damages in the loss of its capital contribution into the Partnership and the loss of profits resulting out of its business in the Partnership Territory.

125.    Defendants breached was the legal cause of Plaintiff's damages because but for Defendants disloyal acts, Plaintiff would not have suffered the loss of its business in the Partnership Territory.

126.    Defendants conduct is so egregious that Defendant should be liable for punitive damages.

127.    Plaintiff is entitled to be repaired through Defendants' payment of damages caused.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enters judgment in its favor and against Defendant as follows:

a.  That Defendant Storkan and Defendant Lyerly had a common law duty of loyalty with respect to Plaintiff:

b.  That Defendant Storkan and Defendant Lyerly breached their fiduciary duties owed to Plaintiff.

c.   That Defendant Storkan's and Defendant Lyerly's breach of their common law duty of loyalty to Plaintiff caused damages to Plaintiff as may be proven in trial and Plaintiff is entitled to those be repaired for such damages.

d.   Partnership Agreement was the legal cause of Plaintiff's damages.

e.   Any others that the court considers just and fair.

**COUNT III – UNJUST ENRICHMENT**
**(against all Defendants)**

128.  Plaintiff reaffirms and reasserts the allegations made in Paragraphs 1 - 92 as if fully recited and reincorporated below.

129.  The Plaintiff conferred a benefit to Defendants in the form of development of a Central America market for the sale of fumigants.

130.  Defendants knew of the benefit that they were receiving from Plaintiff and retained the benefit because they have appropriated the regional market through the use of direct and indirect channels of promotion and distribution, at the expense of Plaintiff.

131.  Plaintiff has suffered damages as a result of Defendants conduct.

132.  Allowing Defendants to continue with the benefits of having taken away the regional market from Plaintiff would result in a grave injustice to Plaintiff.

133.  Plaintiff is entitled to be repaired through damages paid by Defendants.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enters judgment in its favor and against Defendant in the amounts as may be proven at trial, to prevent that Defendants unduly enrich themselves to Plaintiff's detriment or any other remedy that the Court considers just and fair.

Case 8:24-cv-00374-WFJ-TGW    Document 1    Filed 02/09/24    Page 20 of 21 PageID 20

**COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES**
**(against Defendant Lyerly)**

134.    Plaintiff reaffirms and reasserts the allegations made in Paragraphs 1 - 92 as if fully recited and reincorporated below.

135.    Defendant Lyerly substantially aided and abetted Defendant Storkan in breaching his fiduciary duties with respect to Plaintiff.

136.    Plaintiff has suffered damages as a result of Defendant Lyerly's tortious conduct.

137.    Plaintiff's damages have been caused by the conduct that was aided and abetted by Defendant Lyerly.

138.    Plaintiff is entitled to recover for damages suffered.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enters judgment in its favor and against Defendant in the amounts as may be proven at trial or any other relief that the Court may deem just and fair.

**TRIAL BY JURY**

139.    Plaintiff requests that all issues triable by Jury so be tried.

Date: February 9, 2024


Respectfully Submitted,

BAILEY DUQUETTE, P.C.
1700 E. Las Olas Blvd., Suite 207
Fort Lauderdale, Florida 33301
Telephone: 954.374-1111

/s/ German Morales
German Morales (Fla Bar No. 015525)
Lizet Cardozo (Fla Bar No. 115419)
german@baileyduquette.com

lizet@baileyduquette.com
yanina@baileyduquette.com
*Counsel for Plaintiff*